ORIGINAL

Approved: _____

ADAM FEE / IAN MCGINLEY / ANNA SKOTKO
Assistant United States Attorneys

**15 MAG 0215**

HEATHER SCHMIDT
Trial Attorney, Counterespionage Section
National Security Division, Department of Justice

U.S. DISTRICT COURT
FILED
JAN 2 3 2015
S. D. OF N.Y.

DOC # 1

Before:    HONORABLE FRANK MAAS
           United States Magistrate Judge
           Southern District of New York

- - - - - - - - - - - - - - - - x

UNITED STATES OF AMERICA        :

    -v.-                        :

EVGENY BURYAKOV,                :
    a/k/a "Zhenya,"
IGOR SPORYSHEV, and             :
VICTOR PODOBNYY,
                                :
           Defendants.
                                :
- - - - - - - - - - - - - - - - x

SEALED COMPLAINT

Violations of 18 U.S.C. §§
371, 951, & 2

COUNTY OF OFFENSE: NEW YORK

SOUTHERN DISTRICT OF NEW YORK, ss.:

         GREGORY MONAGHAN, being duly sworn, deposes and says that
he is a Special Agent with the Federal Bureau of Investigation ("FBI")
and charges as follows:

### COUNT ONE

### Conspiracy to Act as an Unregistered Agent of a Foreign Government

         1.    From in or about 2012, up to and including the
present, in the Southern District of New York and elsewhere, EVGENY
BURYAKOV, a/k/a "Zhenya," IGOR SPORYSHEV, and VICTOR PODOBNYY, the
defendants, and others known and unknown, willfully and knowingly,
did combine, conspire, confederate, and agree together and with each
other to commit an offense against the United States, to wit, Title
18, United States Code, Section 951.

         2.    It was a part and an object of the conspiracy that

EVGENY BURYAKOV, a/k/a "Zhenya," the defendant, willfully and knowingly, would and did act in the United States as an agent of a foreign government, specifically the Russian Federation, and as an agent of foreign officials, specifically intelligence agents working in New York City for the Russian Federation's Foreign Intelligence Service (the "SVR"), without prior notification to the Attorney General, as required by law, in violation of Title 18, United States Code, Section 951.

## Overt Acts

3.     In furtherance of this conspiracy, and to effect the illegal object thereof, the following overt acts, among others, were committed in the Southern District of New York:

a.     From at least in or about March 2012, up to and including in or about September 2014, EVGENY BURYAKOV, a/k/a "Zhenya," and IGOR SPORYSHEV, the defendants, met on dozens of occasions at locations in and around Manhattan and the Bronx, for the purpose of exchanging information related to their work as intelligence officers operating within the United States at the direction of the Russian SVR.

b.     On or about May 23, 2013, IGOR SPORYSHEV and VICTOR PODOBNYY, the defendants, during a recorded conversation that occurred within a secure office in Manhattan used by SVR agents to send and receive intelligence reports and assignments from Moscow, discussed transmitting to SVR headquarters in Moscow intelligence gathered by BURYAKOV from "confidential talks" in which he participated under the cover of his position as a banker.

(Title 18, United States Code, Section 371.)

## COUNT TWO

## Acting as an Unregistered Agent of a Foreign Government

4.     From in or about 2012, up to and including the present, in the Southern District of New York and elsewhere, EVGENY BURYAKOV, a/k/a "Zhenya," the defendant, did knowingly act in the United States as an agent of a foreign government, specifically the Russian Federation, and as an agent of foreign officials, specifically intelligence agents working in New York City for the SVR, without prior notification to the Attorney General, as required by law, and IGOR SPORYSHEV and VICTOR PODOBNYY, the defendants, did aid and abet the same, in violation of Title 18, United States Code, Sections 951 and 2.

(Title 18, United States Code, Sections 951 and 2.)

The bases for my knowledge and the foregoing charges are, in part, as follows:

5.      I have been a Special Agent with the FBI for approximately seven years.  Currently, I am assigned to the Counterintelligence Division within the New York Field Office of the FBI.  The focus of my counterintelligence efforts has been on investigating the foreign intelligence activities of the Russian Federation.  I have learned the facts contained in this Complaint from, among other sources, my personal participation in this investigation, my discussions with other law enforcement agents, searches that I have conducted, surveillance that I have conducted, and my review of documents, electronic recordings, and other evidentiary materials.  Because this Complaint is being submitted for the limited purpose of establishing probable cause, it does not include every fact that I have learned during the course of this investigation.  Further, any statements related herein are related in substance and in part only.

## I.   **BACKGROUND**

6.      The Foreign Agents Registration Act ("FARA"), Title 22, United States Code, Section 611, *et seq.*, requires individuals residing in the United States who are acting as agents for foreign governments or foreign officials to notify the Attorney General of the United States.  FARA was enacted to ensure that the United States government is aware of those acting within its borders on behalf of foreign governments.  This information permits the United States government to remain informed of the foreign agents' activities in the United States and to protect the national security and foreign policy interests of the United States.  For this purpose, the Department of Justice ("DOJ") maintains records of all individuals who have registered as agents of foreign governments.

7.      The SVR is the foreign intelligence agency for the Russian Federation.  The SVR headquarters is located in Moscow and is known as "Moscow Center" or "Center."  The SVR deploys its agents to foreign countries using several different methods to conceal the agents' work as intelligence agents.  Certain agents are sent on "deep cover" assignments, meaning they are directed to assume false identities, work seemingly normal jobs, and attempt to conceal all

of their connections to Russia.  Certain other SVR agents operating
abroad do not conceal their connections to Russia.  Instead, they
often pose as official representatives of the Russian Federation,
including in positions as diplomats or trade officials.  In these
positions, SVR agents are typically entitled to diplomatic immunity
from prosecution.  A third group of SVR agents stationed abroad pose
as employees of private businesses.  SVR agents operating under such
non-official cover – sometimes referred to as "NOCs" – typically are
subject to less scrutiny by the host government, and, in many cases,
are never identified as intelligence agents by the host government.
As a result, a NOC can be an extremely valuable intelligence asset
for the SVR.  Because NOCs work for private businesses and not the
Russian government, typically they are not entitled to diplomatic
immunity from prosecution.  At the direction and under the control
of the SVR, the primary mission of each of these groups of SVR agents
is to gather information for Russia about the foreign country, and
to recruit intelligence sources that could assist in influencing the
policies of public and private institutions in the foreign country.

        8.    In June 2010, after a multi-year investigation, the
FBI arrested ten covert SVR agents – referred to as the "Illegals"
by the SVR – who were living in the United States on charges of
conspiring to violate Section 951 and conspiring to launder money.
These ten agents were on "deep cover" assignments under the
supervision of the SVR.  In July 2010, each of the ten SVR agents
in the Illegals group pled guilty to conspiracy to violate Section
951.

        9.    Within a few months of those guilty pleas, the FBI
opened an investigation of a new group of SVR agents working in New
York City, which eventually included EVGENY BURYAKOV, a/k/a
"Zhenya," IGOR SPORYSHEV, and VICTOR PODOBNYY, the defendants.

        10.    The FBI's investigation has revealed that EVGENY
BURYAKOV, a/k/a "Zhenya," the defendant, is working within the United
States as an SVR agent under "non-official cover," meaning he entered
and has remained in the United States as a private citizen.
Specifically, BURYAKOV is posing as an employee in the Manhattan
office of a Russian bank ("Bank-1").  In fact, BURYAKOV is an
employee of the SVR working to gather intelligence on behalf of
Russia.  A recently conducted review of DOJ records indicates that
BURYAKOV has never notified DOJ that he is an agent of the Russian
Federation, or of any other country.

11.   The FBI's investigation has further revealed that IGOR SPORYSHEV and VICTOR PODOBNYY, the defendants, are also SVR agents who worked in the United States to gather intelligence on behalf of Russia.   From on or about November 22, 2010, to on or about November 21, 2014, SPORYSHEV served as a Trade Representative of the Russian Federation in New York.   From on or about December 13, 2012, to on or about September 12, 2013, PODOBNYY served as an Attaché to the Permanent Mission of the Russian Federation to the United Nations.   Based on their official government postings on behalf of the Russian Federation, SPORYSHEV and PODOBNYY appear to be exempt from the registration requirement under FARA.   However, that exemption does not permit them to conspire with, or aid and abet, EVGENY BURYAKOV, a/k/a "Zhenya," the defendant, in his work as an unregistered agent of the Russian Federation operating within the United States.

12.   The intelligence-gathering efforts of IGOR SPORYSHEV and VICTOR PODOBNYY, the defendants, included, among other things, (i) attempting to recruit New York City residents as intelligence sources for the Russian Federation; (ii) tasking EVGENY BURYAKOV, a/k/a "Zhenya," the defendant, to gather intelligence; and (iii) transmitting intelligence reports prepared by BURYAKOV back to SVR headquarters in Moscow.   Specifically, during the course of the charged offenses, SPORYSHEV was responsible for relaying assignments from Moscow Center to BURYAKOV, and SPORYSHEV and PODOBNYY were responsible for analyzing and reporting back to Moscow Center about the fruits of BURYAKOV's intelligence-gathering efforts.

13.   The directives from Moscow Center to EVGENY BURYAKOV, a/k/a "Zhenya," IGOR SPORYSHEV, and VICTOR PODOBNYY, the defendants, as well as to other covert SVR agents acting within the United States, included requests to gather intelligence on, among other subjects, potential United States sanctions against the Russian Federation and the United States' efforts to develop alternative energy resources. Many of the directives to the defendants from Moscow Center focused, in particular, on economic issues.   I have learned during the course of this investigation that all three of the defendants work for a particular division of the SVR known as "Directorate ER," which focuses on economic issues.

14.   In the course of this investigation, the FBI has employed a variety of lawful investigative methods.   For example, the FBI has conducted extensive physical and electronic surveillance

5

of the defendants — including the covert placement of microphone-type listening devices in certain locations; the covert placement of video cameras in public locations; the monitoring and recording of the phone calls of certain of the defendants; and the use of a confidential source.   In addition, and among other things, the FBI has lawfully obtained multiple audio recordings of discussions involving certain of the defendants that occurred at various locations within a secure office in Manhattan used by SVR agents to send and receive intelligence reports and assignments from Moscow Center (the "SVR NY Office").

## II.   **THE SVR'S ILLEGAL INTELLIGENCE-GATHERING EFFORTS IN NEW YORK CITY**

### A.   **Clandestine Meetings and Communications**

15.   During the course of their work as covert SVR agents in the United States, the defendants regularly met and communicated using clandestine methods and coded messages.   Based on my training and experience, and my knowledge of this investigation, I believe that they did so in order to exchange intelligence-related information while shielding their associations with one another as SVR agents.   These efforts were designed, among other things, to preserve their respective covers as an employee of a bank in Manhattan (EVGENY BURYAKOV, a/k/a "Zhenya," the defendant), a Trade Representative of the Russian Federation in New York (IGOR SPORYSHEV, the defendant), and an Attaché to the Permanent Mission of the Russian Federation to the United Nations (VICTOR PODOBNYY, the defendant). In particular, the defendants worked to safeguard BURYAKOV's work as a "NOC" – a covert SVR intelligence agent acting under non-official cover in New York.

16.   Specifically, the investigation has revealed that IGOR SPORYSHEV and VICTOR PODOBNYY, the defendants, acted as covert intermediaries for EVGENY BURYAKOV, a/k/a "Zhenya," the defendant, to communicate with Moscow Center on intelligence-related matters. As an agent posing as someone without any official ties to the Russian government or the SVR, BURYAKOV is unable to access the SVR NY Office – which is located within an office maintained by the Russian Federation in New York, New York – without potentially alerting others to his association with the SVR.   As such, BURYAKOV requires the assistance of other SVR agents, like SPORYSHEV and PODOBNYY, to exchange communications and information with Moscow Center through the communications systems located in the SVR NY Office.

17.   In addition, in order to preserve his cover as a private citizen, EVGENY BURYAKOV, a/k/a "Zhenya," the defendant, avoided speaking about intelligence-related matters with IGOR SPORYSHEV, the defendant, over the telephone, by email, or via any other means of communication other than face-to-face meetings, save for one notable exception discussed below in paragraph 42.

18.   From as early as March 2012 through as recently as mid-September 2014, the FBI has conducted physical or electronic surveillance of EVGENY BURYAKOV, a/k/a "Zhenya," and IGOR SPORYSHEV, the defendants, engaging in over four dozen brief meetings, several of which involved BURYAKOV passing a bag, magazine, or slip of paper to SPORYSHEV.   These meetings typically took place outdoors, where the risk of effective surveillance was reduced relative to an indoor location.

19.   These meetings were nearly always preceded by a short telephone call between EVGENY BURYAKOV, a/k/a "Zhenya," and IGOR SPORYSHEV, the defendants, during which one of the men typically told the other that he had an item to give to him.   Typically, during these telephone calls, which were intercepted by the FBI, the item in question was referred to as some non-specific "ticket," "book," "list," or other ordinary item (e.g., "umbrella" or "hat").

20.   Subsequently, at each meeting surveilled by the FBI, the two men met and sometimes exchanged documents or other small items.   Notably, despite discussing on approximately one dozen occasions the need to meet to transfer "tickets," EVGENY BURYAKOV, a/k/a "Zhenya," and IGOR SPORYSHEV, the defendants, have – other than one occasion where they discussed going to a movie – never been observed attending, or discussing in any detail, events that would typically require tickets, such as a sporting event or concert.

21.   Based on my training, experience, and familiarity with this investigation, I believe that in these conversations and meetings, EVGENY BURYAKOV, a/k/a "Zhenya," and IGOR SPORYSHEV, the defendants, used coded language to signal that they needed to meet, and then met to exchange intelligence information, whether verbally, in written form, or both.   These types of face-to-face meetings and the exchange of hand-written notes are the preferred methods for exchanging intelligence assignments and reports because they carry minimal risk of electronic interception.

**B.    Sporyshev and Podobnyy's Discussions of Their Work as SVR Agents**

22.    In numerous recorded communications, IGOR SPORYSHEV and VICTOR PODOBNYY, the defendants, discussed their work as SVR agents covertly operating in the United States.

### i.    January 31, 2013: Sporyshev's Employment with the SVR

23.    On or about January 31, 2013, IGOR SPORYSHEV, the defendant, and another SVR agent not identified herein ("CC-1") had a discussion inside the SVR NY Office about their contracts with the SVR.    SPORYSHEV stated that, "Everyone has a five-year contract," and explained, in response to CC-1's question about reimbursement for the travel of SVR agents' family members, that "travel for military personnel and their families on authorized home leave is paid, and in our, in our SVR, this, the payment for getting to and from the duty station."[1]

### ii.    April 10, 2013: Sporyshev's and Podobnyy's Cover in the United States

24.    On or about April 10, 2013, VICTOR PODOBNYY, the defendant, and another SVR agent not identified herein ("CC-2") had a discussion inside the SVR NY Office about the "cover" job of IGOR SPORYSHEV, the defendant, in the United States.    Referring to SPORYSHEV, whom CC-2 described as PODOBNYY's "boss," CC-2 asked PODOBNYY: "What is his cover?  The Chamber of Commerce?"  PODOBNYY responded: "No, no.  New York Office of the Trade Mission of the Russian Federation in the United States."  During the course of this investigation, I have learned that SPORYSHEV publicly identified himself as a Trade Representative of the Russian Federation in New York, which is a position within the Trade Mission of the Russian Federation in the United States.

25.    Also on or about April 10, 2013, IGOR SPORYSHEV and VICTOR PODOBNYY, the defendants, had the following discussion inside the SVR NY Office about certain problems with the covers they were using in the United States as well as their day-to-day work as covert SVR agents:

Victor Podobnyy ("VP"): [Y]ou don't know how many times I felt

---

[1] All of the recorded conversations described and quoted herein were conducted in Russian, unless otherwise noted.  Those descriptions and quotations are based on preliminary translations of the conversations and are subject to revision.

8

when I was sitting on [U/I] for the first time and started processing for the SVR of the RF [Russian Federation].  The fact that I'm sitting with a cookie right now at the [. . .] chief enemy spot.  Fuck!  Not one point of what I thought then, [U/I] not even close. [U/I] movies about James Bond.  Of course, I wouldn't fly helicopters, but pretend to be someone else at a minimum.

Igor Sporyshev ("IS"): I also thought that at least I would go abroad with a different passport. . .  I'm doing tomorrow until lunch.  I'm sitting working the clean line in the morning and then I will come here and work on operational.

26.   Based on my training, experience, and familiarity with this investigation, I believe that, in this conversation, VICTOR PODOBNYY, the defendant, contrasted the mundane aspects of his work as an intelligence agent abroad with fictional concepts of an intelligence agent's work, and expressed surprise that he was not given a new identity by the SVR while operating as an intelligence agent ("not even close [U/I] movies about James Bond.  Of course, I wouldn't fly helicopters, but pretend to be someone else at a minimum.").   IGOR SPORYSHEV, the defendant, agreed, stating that he thought he would at least get a different passport to hide his true identity.   SPORYSHEV concluded by stating that, the next day, he would be working at his cover position at the Russian Trade Office (the "clean line") in the morning and would then travel to the SVR NY Office to work on his intelligence-related tasks ("then I will come here and work on operational").

### iii. **April 25, 2013: The Illegals Program**

27.   On or about April 25, 2013, IGOR SPORYSHEV and VICTOR PODOBNYY, the defendants, discussed the use of nontraditional cover for Russian intelligence officers and, in particular, the Illegals program that ended with the arrest of 10 SVR agents in July 2010, as discussed above:

VP:  First of all, Directorate S is the only intelligence that is real intelligence, Directorate S.

IS:  It was.

VP:  I don't know about now.  No some things remain, like Middle East, Asia, not everything has fallen.

.  .  .

VP:  Look, in the States even the S couldn't do anything.  They

caught ten of them.   And you remember what they were charged
with: illegal cashing [of the money] the Center sent, that's
all!   And then Putin even tried to justify that they weren't
even tasked to work, they were sleeper cells in case of martial
law.   They weren't doing shit here, you understand.   Maybe they
had a directive not to do anything, if they were here 10 years
or whatever . . . they were in the States in the sleeper mode
only.

Well, they studied some people, worked out some exits, but they
didn't get any materials. . . .   It would've been a lot prettier
than just wrongly filled out immigration, false identity, and
money laundering.   Well, they got slapped with money laundering
only because they were sending cash by mail.   That is it.   So,
when we discussed that we need to work from different positions,
I agree that untraditional is more effective but even the S
cannot do anything here.

        28.   Based on my training, experience, and familiarity
with this investigation, I believe that, in this conversation, IGOR
SPORYSHEV and VICTOR PODOBNYY, the defendants, explicitly discussed
the use of "untraditional" intelligence agents, such as the 10
Russian intelligence officers arrested in June 2010 (i.e., the
Illegals).   PODOBNYY first noted that "Directorate S" is the only
division of the SVR conducting "real intelligence."   From my
training and experience, I know that Directorate S is the division
within the SVR responsible for nontraditional espionage, including
programs like the Illegals program and SVR agents operating under
non-official cover, like EVGENY BURYAKOV, a/k/a "Zhenya," the
defendant.   PODOBNYY then discussed his views on the value of the
intelligence-gathering efforts of the Illegals in the United States
("Look, in the States even the [Directorate] S couldn't do anything.
They caught ten of them."); his understanding of the statements made
by certain Russian leaders after the Illegals' arrests ("And then
Putin even tried to justify that they weren't even tasked to work,
they were sleeper cells in case of martial law."); and the crimes
with which they were charged in the United States in July 2010
("remember what they were charged with: illegal cashing [of the
money] the Center sent"), among other things.   PODOBNYY concluded
by stating that, while he agreed that "untraditional" intelligence
agents were "more effective," the SVR's Illegals program was
ultimately a failure ("even the S cannot do anything here").

C.  **Sporyshev and Podobnyy's Attempts to Recruit Intelligence
Sources in New York City**

29.   In numerous recorded communications, IGOR SPORYSHEV
and VICTOR PODOBNYY, the defendants, discussed their attempts to
recruit United States residents, including several individuals
employed by major companies, and several young women with ties to
a major university located in New York, New York ("University-1"),
as intelligence sources for the SVR.   On these recordings, the
defendants discussed the potential value of these sources, and
identified particular sources by use of a "source name," which
appears to be a coded name.   In addition, during these recordings,
SPORYSHEV and PODOBNYY discussed the efforts of other SVR agents to
recruit a number of other Russian-origin individuals associated with
University-1 as intelligence sources.   The excerpts below are
representative examples of PODOBNYY and SPORYSHEV discussing
attempts to recruit intelligence sources in New York City.

30.   On or about April 8, 2013, IGOR SPORYSHEV, the
defendant, made the following comments to VICTOR PODOBNYY, the
defendant, during a recorded conversation in the SVR NY Office about
potential intelligence sources being targeted by the SVR.   The
potential source referred to as "Female-1" below was a female
employee of a financial consulting firm in New York City.   The
potential source referred to as "Female-2" below was another female
recruitment target located in New York City:

IS:  With [Female-1], we started that I needed answers to some
questions, answers to which I could not find in open sources.
Due to that I am interested to find information from paid
publications and opinions of independent people who discuss
these topics amongst themselves behind closed doors . . . .
There was a positive response without any feelings of rejection.

But there was a problem with [Female-2] . . . .  I have lots
of ideas about such girls but these ideas are not actionable
because they don't allow to get close enough.   And in order to
be close you either need to fuck them or use other levers to
influence them to execute my requests.   So when you tell me
about girls, in my experience, it's very rare that something
workable will come of it.

31.   I have learned from speaking with another FBI agent
("Agent-2"), that, after learning of several conversations between
IGOR SPORYSHEV and VICTOR PODOBNYY, the defendants, regarding the
targeting of young female students and recent graduates of
University-1, Agent-2 interviewed two young women – both recent

11

graduates of University-1. Each woman interviewed by Agent-2 discussed PODOBNYY by name, and stated that PODOBNYY tried to ingratiate himself and gain information from each of them.

        32. Also on or about April 8, 2013, IGOR SPORYSHEV and VICTOR PODOBNYY, the defendants, discussed PODOBNYY's efforts to recruit a male working as a consultant in New York City ("Male-1") as an intelligence source:

    VP: [Male-1] wrote that he is sorry, he went to Moscow and forgot to check his inbox, but he wants to meet when he gets back. I think he is an idiot and forgot who I am. Plus he writes to me in Russian [to] practice the language. He flies to Moscow more often than I do. He got hooked on Gazprom thinking that if they have a project, he could be rise up. Maybe he can. I don't know, but it's obvious that he wants to earn lots of money . . . .

    IS: Without a doubt.

    VP: He said that they have a new project right now, new energy boom

    . . .

    VP: He says that it is about to take off. I don't say anything for now.

    IS: Yeah, first we will spend a couple of borrowed million and then . . . .

    VP: [UI] [laughs] it's worth it. I like that he takes on everything. For now his enthusiasm works for me. I also promised him a lot: that I have connections in the Trade Representation, meaning you that you can push contracts [laughs]. I will feed him empty promises.

    IS: Shit, then he will write me. Not even me, to our clean one.

    VP: I didn't say the Trade Representation . . . I did not even indicate that this is connected to a government agency. This is intelligence method to cheat, how else to work with foreigners? You promise a favor for a favor. You get the documents from him and tell him to go fuck himself. But not to upset you, I will take you to a restaurant and give you an expensive gift. You just need to sign for it. This is ideal working method.

33.   Based on my training, experience, and participation in this investigation, I believe that, in this conversation, IGOR SPORYSHEV and VICTOR PODOBNYY, the defendants, discussed PODOBNYY's attempted use of Male-1 as an intelligence source for Russia. PODOBNYY stated that PODOBNYY had emailed with Male-1 ("[Male-1] wrote that he is sorry"), who was interested in business opportunities in Russia ("He got hooked on Gazprom [a Russian energy company] . . . it's obvious he wants to earn lots of money"). PODOBNYY stated that PODOBNYY "promised [Male-1] a lot" in terms of PODOBNYY's connections in Russia, including that PODOBNYY is connected to SPORYSHEV at the Trade Office, but that these promises were "empty promises."  After SPORYSHEV expressed concern that Male-1 might actually contact SPORYSHEV at SPORYSHEV's cover position, PODOBNYY told SPORYSHEV not to worry because PODOBNYY did not tell Male-1 that SPORYSHEV was connected to the Russian Government.  PODOBNYY then explained his recruitment method, which includes cheating, promising favors, and then discarding the intelligence source once the relevant information is obtained by the SVR ("This is intelligence method to cheat . . .  You promise a favor for a favor.  You get the documents from him and tell him to go fuck himself.").

34.   On or about June 13, 2013, Agent-2 and I interviewed Male-1.  Male-1 stated that he first met VICTOR PODOBNYY, the defendant, in January 2013 at an energy symposium in New York City. During this initial meeting, PODOBNYY gave Male-1 PODOBNYY's business card and two email addresses.  Over the following months, Male-1 and PODOBNYY exchanged emails about the energy business and met in person on occasion, with Male-1 providing PODOBNYY with Male-1's outlook on the current and future of the energy industry. Male-1 also provided documents to PODOBNYY about the energy business.

## D.   **Buryakov's Work for the SVR**

35.   The FBI's investigation has also revealed that, throughout the period of the charged offenses, EVGENY BURYAKOV, a/k/a "Zhenya," the defendant, worked both to respond to intelligence assignments relayed to him by IGOR SPORYSHEV, the defendant, and to use his cover as a banker to proactively gather intelligence about matters of interest to the Russian Federation.

### i.   **Intelligence Taskings Passed Between the Defendants**

36.   As discussed below, IGOR SPORYSHEV, the defendant, was responsible for relaying intelligence assignments from Moscow Center to EVGENY BURYAKOV, a/k/a "Zhenya," the defendant.  Based on my knowledge of this investigation, I believe that nearly all of these

assignments were communicated during face-to-face meetings between SPORYSHEV and BURYAKOV, which were typically preceded by telephone calls in which the two men discussed exchanging, for example, "tickets" or "a list."  As discussed in the following paragraphs, however, the FBI obtained electronic recordings of several conversations relating to such intelligence directives being communicated to and carried out by BURYAKOV in his position as an SVR agent acting under non-official cover.

### a.   May 21, 2013: Soliciting Questions for the Russian Media for Intelligence Purposes

37.  On or about May 21, 2013, IGOR SPORYSHEV, the defendant, called EVGENY BURYAKOV, a/k/a "Zhenya," the defendant, to ask for BURYAKOV's help in formulating questions to be used for intelligence-gathering purposes by others associated with a leading Russian state-owned news organization (the "News Organization").

38.  From my training and experience, I know that the News Organization has been publicly identified by former SVR agents as an organization that is sometimes used by Russian intelligence to gain access to and gather intelligence under the cover of the news media.

39.  During the May 21, 2013 telephone call between EVGENY BURYAKOV, a/k/a "Zhenya," and IGOR SPORYSHEV, the defendants, which was intercepted by the FBI, the following exchange occurred:

EVGENY BURYAKOV ("EB"):  Hello?

IS:  Hello Evgeny.

EB:  Hey.

IS:  Can you talk? . . . I need help.

EB:  Aha.

IS:  [The News Organization] wants very much, I don't know how it came down from the top, but they need three questions with regard to the New York Exchange.  What would be interesting to us.  Can you help write something?

EB:  It's a difficult question. . . . I need to think.

IS:  Can you think of something in fifteen minutes?

EB:  Fifteen minutes?

IS:  Yes.

EB:  I'll try. . . .  Should I call you?

IS:  Yes, call me.

EB:  If you will not pass by me?

IS:  No, I will not.

40.   Approximately 20 minutes later, IGOR SPORYSHEV, the defendant, called EVGENY BURYAKOV, a/k/a "Zhenya," the defendant, and the following conversation, which was intercepted by the FBI, occurred:

EB:  Well, I thought about it.  I don't know whether it will work for you but you can ask about ETF. . . .  E-T-F. E, exchange.

IS:  Yes, got it.

EB:  How they are used, the mechanisms of use for destabilization of the markets.

IS:  Mechanism – of – use – for – market – stabilization in modern conditions.

EB:  For destabilization.

IS:  Aha.

EB:  Then you can ask them what they think about limiting the use of trading robots. . . .  You can also ask about the potential interest of the participants of the exchange to the products tied to the Russian Federation.

41.   Based on my training, experience, and participation in this investigation, I believe that, in this conversation, IGOR SPORYSHEV, the defendant, asked for, and obtained from, EVGENY BURYAKOV, a/k/a "Zhenya," the defendant, questions of interest to the Russian economic intelligence community that were to be used by others associated with the News Organization.  SPORYSHEV began the conversation by asking for help ("I need help").  SPORYSHEV said that a request came down from leadership, which I believe to be a reference to the SVR leadership, to pass three questions regarding the New York Stock Exchange to the News Organization ("[The News Organization] wants very much . . . it came down from the top, but they need three questions with regard to the New York Exchange").

42.   In a notable departure from every other intercepted

conversation involving these two men, IGOR SPORYSHEV, the defendant, made it clear in this call that the two men did not have time to meet in person to discuss this intelligence assignment.  Rather, SPORYSHEV asked EVGENY BURYAKOV, a/k/a "Zhenya," the defendant, to get back to him within "fifteen minutes" ("Can you think of something in fifteen minutes?").  BURYAKOV then suggested he would call SPORYSHEV back but only if SPORYSHEV was unable to meet in person (IS: "Yes, call me."; EB: "If you will not pass by me?").  I believe that this time pressure is the reason that this particular intelligence assignment was relayed over a telephone line rather than in person.

43.  IGOR SPORYSHEV, the defendant, then called EVGENY BURYAKOV, a/k/a "Zhenya," the defendant, back to supply a particular line of questioning for use by the News Organization.  Specifically, BURYAKOV said the News Organization could ask about how the New York Stock Exchange ("NYSE") used exchange-traded funds or "ETF"; potential limits on the use of high-frequency, automated trading systems ("trading robots"); and the potential interest among NYSE members to products tied to Russia ("products tied to the Russian Federation").

44.  Based on my training and experience, and my familiarity with this investigation, I believe that neither defendant's cover position – banker (EVGENY BURYAKOV, a/k/a "Zhenya," the defendant) and a Trade Office representative (IGOR SPORYSHEV, the defendant) – involves providing assistance to Russian journalists.  Nor do their covers explain why the two men would be engaging in a discussion about crafting questions that "would be interesting to us" and that the News Organization representatives should put to New York Stock Exchange employees.

### b.  **March 28, 2014: Economic Sanctions Intelligence**

45.  Another example of an intelligence tasking occurred in late March 2014.  Specifically, on or about March 28, 2014, IGOR SPORYSHEV, the defendant, during an audio-recorded conversation, told  EVGENY BURYAKOV, a/k/a "Zhenya," the defendant, that SPORYSHEV needed help researching the "effects of economic sanctions on our country," among other things.

46.  A few days later, on April 2, 2014, IGOR SPORYSHEV, the defendant, called EVGENY BURYAKOV, a/k/a "Zhenya," the defendant, and stated, in an intercepted conversation, that he had not seen BURYAKOV in a while, and asked to meet BURYAKOV outside Bank-1's office in Manhattan in 20 minutes.  A covert physical search of BURYAKOV's computer at Bank-1 revealed that, at around the time

of this telephone call, BURYAKOV conducted the following internet searches: "sanctions Russia consiquences" [sic] and "sanctions Russia impact."

47.    Two days later, on April 4, 2014, EVGENY BURYAKOV, a/k/a "Zhenya," the defendant, called IGOR SPORYSHEV, the defendant, and said, in an intercepted conversation, that he (BURYAKOV) "wrote you an order list," and suggested that they meet.   Approximately 20 minutes later, SPORYSHEV met BURYAKOV in BURYAKOV's driveway.   Their encounter, which was captured by a video surveillance camera located near BURYAKOV's residence, lasted approximately two minutes.   On the video footage, the defendants appeared to exchange a small object.

48.    Based on my training, experience, and familiarity with this investigation, I believe that, in this series of intercepted communications and surveilled meetings, IGOR SPORYSHEV, the defendant, relayed an intelligence-gathering assignment to EVGENY BURYAKOV, a/k/a "Zhenya," the defendant (to research "the effect of economic sanctions . . . on our country"), BURYAKOV explored the subject through internet searches and potentially other intelligence-gathering efforts, and later gave that information to SPORYSHEV (the "order list") during an exchange in BURYAKOV's driveway.

## ii.   **Proactive Intelligence-Gathering Work by Buryakov**

### a.   **April 11, 2013: Buryakov's Prior Work as an Intelligence Agent in Another Country**

49.    I have learned from reviewing an application submitted by EVGENY BURYAKOV, a/k/a "Zhenya," the defendant, for a United States work visa that, before coming to the United States in August 2010, BURYAKOV worked for approximately five years as an employee at a Bank-1 office in a country outside of Russia and the United States ("Country-1").   I have also reviewed a recorded conversation between IGOR SPORYSHEV and VICTOR PODOBNYY, the defendants, that reveals that BURYAKOV has worked as an intelligence agent posing under the cover of his job as a banker both within and outside the United States, including during his time as an employee of Bank-1 in Country-1.

50.    Specifically, on or about April 11, 2013, IGOR SPORYSHEV and VICTOR PODOBNYY, the defendants, had a conversation, which was recorded, inside the SVR NY Office, during which PODOBNYY stated:

VP:   Zhenya [BURYAKOV] told [me] that [SVR Superior-1] came to

17

[Country-1] to [visit] the representative but he was not number one person.  He had a boss in [Country-1].  Because he told me that [SVR Superior-1] visited Zhenya.  Even his boss didn't know that Zhenya was undercover.  He didn't know that Zhenya is an employee of the Service.  And Zhenya's boss goes like, take him to a restaurant tonight.  They sat, the three of them and in the restaurant [SVR Superior-1] introduced Zhenya in his new capacity.  Zhenya says he doesn't know to this day why he did that, it seems [he wanted] to exclude [the possibility] of interagency frictions.  He told me that himself.

51.  Based on my training, experience, and familiarity with this investigation, I believe that, in this conversation, VICTOR PODOBNYY, the defendant, recounted a story told to him by EVGENY BURYAKOV, a/k/a "Zhenya," the defendant (referred to using the Russian familiar form of the name "Evgeny": "Zhenya").  According to PODOBNYY's account, the individual referred to as "SVR Superior-1" – whom I know, based on my knowledge of this investigation and of the SVR more generally, to be the former head of the Directorate ER division of the SVR and BURYAKOV's former SVR supervisor – visited Country-1 during BURYAKOV's tenure as a Bank-1 employee and intelligence agent in Country-1.

52.  According to the account of VICTOR PODOBNYY, the defendant, EVGENY BURYAKOV, a/k/a "Zhenya," the defendant, had at least one supervisor in his cover job at Bank-1 in Country-1, and his supervisor was unaware, prior to SVR Superior-1's visit, of BURYAKOV's work as an SVR agent working under non-official cover ("[h]e had a boss in [Country-1] . . . even his boss didn't know that Zhenya was undercover").  At a dinner involving BURYAKOV, SVR Superior-1, and BURYAKOV's boss at Bank-1, SVR Superior-1 revealed BURYAKOV's role as an intelligence agent ("in the restaurant [SVR Superior-1] introduced Zhenya in his new capacity").  PODOBNYY also made clear that this story was told to him by BURYAKOV "himself."

53.  Based on my training, experience, and familiarity with this investigation, I believe this conversation reflects co-conspirators of EVGENY BURYAKOV, a/k/a "Zhenya," the defendant, discussing BURYAKOV's historical work as an SVR agent in the country in which he lived before coming to the United States.

**b.   May 23, 2013: Buryakov Provides Intelligence Regarding an Airplane Manufacturing Deal in Country-2**

54.  I have learned from reviewing published news reports that, in or about late 2013, published accounts detailed the final

18

stages of negotiations relating to a multi-billion dollar transaction between a state-owned Russian corporation and an airplane manufacturer ("Company-1") based in another country outside of the United States and Russia ("Country-2"). Under the terms of the proposed agreement, the Russian corporation agreed to purchase dozens of Company-1's airplanes, on the condition that the airplanes would be built at a new manufacturing plant in Russia.

55.   During the course of this investigation, I have learned that, in the months preceding public reports regarding the airplane manufacturing deal, EVGENY BURYAKOV, a/k/a "Zhenya," the defendant, was gathering intelligence about the potential deal and, with the assistance of IGOR SPORYSHEV and VICTOR PODOBNYY, the defendants, was analyzing it and providing it to their SVR supervisors at Moscow Center.

56.   I have learned from reviewing travel records, among other things, that EVGENY BURYAKOV, a/k/a "Zhenya," the defendant, traveled to Country-2 in November 2012 and March 2013 in order to attend conferences held there by a trade association based in Country-2. Based on my review of emails BURYAKOV sent and received in advance of both trips, I have learned that BURYAKOV attended the conferences as a representative of Bank-1. In truth, however, during both his November 2012 and March 2013 trips to Country-2, BURYAKOV was gathering intelligence for the SVR during confidential meetings with representatives of Company-1 and others.

57.   I have reviewed a report regarding the November 2012 trip to Country-2 prepared by EVGENY BURYAKOV, a/k/a "Zhenya," the defendant, in his capacity as a Bank-1 employee (the "Report"). In or about August 2013, the FBI downloaded the Report from BURYAKOV's work computer during a lawful, covert physical search of his office. The Report recounts BURYAKOV's meetings at the November 2012 conference with a senior executive of Company-1 ("Executive-1"), and noted that Company-1's management viewed Russia as a promising market for airplane sales. The Report bears a Bank-1 watermark and is addressed to BURYAKOV's supervisor at Bank-1. The Report makes no reference to BURYAKOV relating any of the information about the potential deal to intelligence agents, or submitting a proposal to Moscow Center – or any other component of the Russian Federation – for assistance.

58.   From reviewing travel records, email communications involving EVGENY BURYAKOV, a/k/a "Zhenya," the defendant, and publicly available records relating to the March 2013 conference, I have learned that BURYAKOV attended the March 2013 conference at the same time as Executive-1 and that he (BURYAKOV) did so ostensibly

in his capacity as an employee of Bank-1.

59.   From reviewing audio-recorded conversations involving IGOR SPORYSHEV and VICTOR PODOBNNY, the defendants, inside of the SVR NY Office, I have learned that, while EVGENY BURYAKOV, a/k/a "Zhenya," the defendant, was holding himself out as an employee of Bank-1 at the conferences in Country-2 in or about November 2012 and March 2013, he was also gathering and reporting on the progress of the proposed airplane deal to the SVR, and crafting a proposal for Moscow Center to attempt to influence the course of the negotiations in Russia's favor.

60.   Specifically, on or about May 23, 2013, IGOR SPORYSHEV and VICTOR PODOBNNY, the defendants, had the following audio-recorded conversation inside the SVR NY Office regarding, among other things, the role of EVGENY BURYAKOV, a/k/a "Zhenya," the defendant, in developing intelligence about the Company-1 deal:

IS:   Zhenya [BURYAKOV] drafted, what do you call it, a proposal [U/I].

VP:   Aha.

IS:   I will have to process it now [U/I].

VP:   What's the subject matter?

IS:   . . . He drafted, as I told you before, about [Company-1] planes.

VP:   So what's his idea?

IS:   The idea is that [individuals in Country-2] want to set up the assembly of mid-range airplanes that fall between [two particular airplane sizes]. . . .

VP:   Where do they want to set up the assembly?

IS:   In Russia.

VP:   That's an important point.

IS:   It's like, to attract the technologies, and besides they are talking about the possibility of assembling airplanes with a possibility of selling, to export them from Russia.

VP:   Aha.

IS:   But the [Country-2] unions are resisting. Therefore, the

proposal for MS[2] is geared towards pressuring the unions and securing from the company a solution that is beneficial to us.

\*\*\*

VP:   It's strange to offer a [Country-2] proposal from New York.

IS:   Why?

VP:   It's considered bad taste. What the fuck?  Can't [Country-2] sort this out?  [Country-2 office] can [U/I].

IS:   First of all he had meetings with [a senior executive] of the company.

VP:   Well, if he can cite that then.

IS:   Naturally, we are not just dumping this.  It's because he was there on business.  He held a number of meetings there, and strictly speaking, where's this information from?  It's the result of confidential talks.

VP:   I think our industrialists, on that side, know that unions are a problem.

IS:   I don't know.  Right now we don't have a person there who would be responsible for the economic questions

. . .

IS:   Naturally. We are talking about a proposal for MS, but there's an entire directorate that should think about whether [we] need it or not.

61.   Based on my training, experience, and familiarity with this investigation, I believe that, in this conversation, IGOR SPORYSHEV and VICTOR PODOBNYY, the defendants, discussed intelligence gathered by EVGENY BURYAKOV, a/k/a "Zhenya," the defendant, while working in his cover position as a Bank-1 employee. SPORYSHEV began the discussion by stating that BURYAKOV wrote a report about a potential deal involving Company-1 manufacturing airplanes in Russia ("Zhenya drafted . . . a proposal . . . about [Company-1] airplanes").  SPORYSHEV then noted that labor unions in

_____

[2] Based on my training and experience in investigating the SVR, I have learned that the acronym "MS" is commonly used by the SVR to refer to the "Active Measures Directorate" of the SVR, which is responsible for implementing proactive measures designed to influence global political and economic events in Russia's favor.

Country-2 were opposing the deal ("the [Country-2] unions are resisting"). Thus, BURYAKOV's proposal was for the SVR's "Active Measures" directorate – referred to as "MS" – to influence the unions and Country-2 ("the proposal for MS is geared towards pressuring the unions").

62.   VICTOR PODOBNYY, the defendant, reacted to the summary of the proposal by noting that it was odd to route a proposal relating to a matter in Country-2 through the SVR's New York office ("[i]t's strange to offer a [Country-2] proposal from New York . . . Can't [Country-2] sort this out?"). IGOR SPORYSHEV, the defendant, responded by stating that EVGENY BURYAKOV, a/k/a "Zhenya," the defendant, gathered this intelligence through "meetings with" a senior executive of Company-1, and that the SVR New York Office was going to maintain control over the information ("we are not just dumping this . . . it's the result of confidential talks").

63.   IGOR SPORYSHEV, the defendant, also noted that the SVR office in Country-2 did not have any agents responsible for economic intelligence ("Right now we don't have a person there who is responsible for the economic questions"). SPORYSHEV concluded by stating that the matter being discussed was a proposal for a strategy to be created by the Active Measures Directorate within the SVR, and that another group, or "directorate," would be responsible for deciding whether to implement the strategy to influence the Company-1 deal ("We are talking about a proposal for MS, but there's an entire directorate that should think about whether [we] need it or not.").

64.   I believe that this evidence highlights the value of EVGENY BURYAKOV, a/k/a "Zhenya," the defendant, as an SVR agent operating in the United States without an official cover. Because he was operating as a "private" employee unbeknownst to any of the other participants, BURYAKOV was able to participate in a foreign conference attended by bankers and representatives of private companies, and to join in meetings where conference attendees shared information about a potential multi-billion dollar manufacturing agreement between Russia and Company-1, all of which he could then use for intelligence-related purposes as an SVR agent.

65.   In fact, as reflected in the conversation quoted above, relying on this intelligence, EVGENY BURYAKOV, a/k/a "Zhenya," the defendant, crafted a "proposal" for an SVR division to attempt to defeat the opposition of unions within Country-2 to the proposed deal. BURYAKOV routed this proposal, and the intelligence he gathered about the proposed deal, through IGOR

SPORYSHEV, the defendant, his official cover counterpart at the SVR NY Office.  SPORYSHEV and his fellow SVR agent, VICTOR PODOBNYY, the defendant, discussed what steps to take with respect to the proposal drafted by BURYAKOV before deciding to transmit the proposal to the Active Measures Directorate in Moscow.

### c.   Buryakov's Receipt of Purported Official United States Government Documents

66.   As set forth below, in the summer of 2014, EVGENY BURYAKOV, a/k/a "Zhenya," the defendant, met numerous times with a confidential source working for the FBI ("CS-1").  CS-1 posed as the representative of a wealthy investor looking to work with Bank-1 to develop casinos in Russia.  Based on my review of audio recordings of BURYAKOV's meetings with CS-1, as well as my knowledge of this investigation, I believe that, during the course of these meetings, BURYAKOV's statements and conduct reflected his strong desire to obtain information about subjects far outside the scope of his work as a bank employee, and consistent with his interests as a Russian intelligence agent.  These meetings established BURYAKOV's willingness to solicit and accept documents that CS-1 claimed he had obtained from a U.S. government agency and which purportedly contained information potentially useful to the Russian Federation. The following is based on my discussions with CS-1, my review of audio recordings of CS-1's meetings with BURYAKOV, surveillance conducted by the FBI, and lawful interceptions of conversations between BURYAKOV and IGOR SPORYSHEV, the defendant.

67.   On or about July 22, 2014, CS-1 called EVGENY BURYAKOV, a/k/a "Zhenya," the defendant.  CS-1 arranged to meet BURYAKOV at Bank-1's offices in Manhattan on July 25, 2014.

68.   On or about July 22, 2014, EVGENY BURYAKOV, a/k/a "Zhenya," and IGOR SPORYSHEV, the defendants, had a conversation. BURYAKOV and SPORYSHEV discussed an email to BURYAKOV regarding the potential development of casinos in Russia.  BURYAKOV stated that the subject of the email was concerning "some sort of fucking nonsense" relating to casinos.  SPORYSHEV stated, "It's unclear . . .  Casino, Russia, like, some sort of a set up.  Trap of some sort. I cannot understand what the point is."  SPORYSHEV added, "You could meet [an associate of CS-1] if you want – you will look and decide for yourself."

69.   Based on my training, experience, and participation in this investigation, I believe that, in this conversation, EVGENY BURYAKOV, a/k/a "Zhenya," and IGOR SPORYSHEV, the defendants, discussed BURYAKOV's upcoming meeting with CS-1.  BURYAKOV referred

to a meeting as relating to "some sort of fucking nonsense." SPORYSHEV responded that the meeting with CS-1 about a "casino" in "Russia" might be "some sort of set up" and a "[t]rap of some sort." Nevertheless, SPORYSHEV, acting as BURYAKOV's SVR handler, permitted BURYAKOV to meet with CS-1 ("you could meet him if you want").

70.   On or about July 25, 2014, CS-1 met EVGENY BURYAKOV, a/k/a "Zhenya," the defendant, at Bank-1's offices in Manhattan. CS-1 explained that CS-1 was interested in developing casinos in Russia.   CS-1 invited BURYAKOV to visit his office in Atlantic City, New Jersey to further discuss the casino project.   BURYAKOV agreed.

71.   On or about August 7, 2014, EVGENY BURYAKOV, a/k/a "Zhenya," and IGOR SPORYSHEV, the defendants, spoke about BURYAKOV's trip to Atlantic City scheduled for the next day.   SPORYSHEV told BURYAKOV not to drive to Atlantic City, but rather to let another man ("Male-2") drive.

72.   On or about August 8, 2014, CS-1 met with EVGENY BURYAKOV, a/k/a "Zhenya," the defendant, and Male-2 in Atlantic City. The meeting lasted from around noon to 7:00 p.m. and included a tour of casinos in Atlantic City.   At the end of the day, CS-1 took BURYAKOV and Male-2 to CS-1's office, where CS-1 gave a PowerPoint presentation on the proposed casino project in Russia.   At the end of the PowerPoint presentation, CS-1 noted that U.S. sanctions against Russia could have an impact on their project.   CS-1 also presented BURYAKOV with a United States Government document ("Government Document-1"), labeled "Internal Treasury Use Only," which contained a list of Russian individuals who had been sanctioned by the United States.   CS-1 stated that CS-1 had a contact in the United States Government and could get more information about sanctions if BURYAKOV was interested.   BURYAKOV replied that he was interested in such information.   At the end of the meeting, BURYAKOV asked if he could keep Government Document-1, which CS-1 then handed to BURYAKOV.   BURYAKOV took the document with him and left the meeting.

73.   On or about August 28, 2014, CS-1 met with EVGENY BURYAKOV, a/k/a "Zhenya," the defendant, at Bank-1 again.   During this meeting, CS-1 gave BURYAKOV another United States Government document, labeled "UNCLASSIFIED/FOUO,"[3] which was a list of Russian banks, broken down by size ("Government Document-2").   CS-1 told BURYAKOV that CS-1 obtained the list from his contact in the United States Government.   CS-1 also stated that the United States Government was using this list to identify Russian banks on which

---

[3] "FOUO" is an acronym that stands for "For Official Use Only."

to impose sanctions.  BURYAKOV asked CS-1 for more information
regarding sanctions, specifically when more sanctions will be
imposed, the type of sanctions to be imposed and which entities will
be named in future sanctions.  BURYAKOV also stated that he would
like any information about sanctions that CS-1 could obtain, not just
information limited to the financial sector.  BURYAKOV took
Government Document-2 during the course of the meeting and left the
meeting with the document.

       74.  Immediately after the August 28, 2014 meeting with
CS-1, EVGENY BURYAKOV, a/k/a "Zhenya," the defendant, called IGOR
SPORYSHEV, the defendant.  BURYAKOV asked SPORYSHEV whether
SPORYSHEV received "the schoolbooks."  BURYAKOV and SPORYSHEV then
made plans to meet that night.  BURYAKOV left the Bank-1 office that
night around 7:15 p.m. holding a briefcase, and traveled directly
to SPORYSHEV's home in the Bronx, New York.  BURYAKOV remained at
SPORYSHEV's home for approximately 40 minutes, before leaving with
the briefcase.  Based on my training, experience, and participation
in this investigation, I believe that, after BURYAKOV obtained
Government Document-2 from CS-1 on August 28, 2014, BURYAKOV called
SPORYSHEV to inform SPORYSEHV he had intelligence information for
SPORYSHEV, referring to Government Document-2 by code as "the
schoolbooks."  Based on my training and experience, and my knowledge
of this investigation, I further believe that BURYAKOV then went to
SPORYSHEV's home and Government Document-2 with SPORYSHEV, which
BURYAKOV had carried in the briefcase.

WHEREFORE, deponent prays that warrants be issued for the arrests of EVGENY BURYAKOV, a/k/a "Zhenya," IGOR SPORYSHEV, and VICTOR PODOBNYY, the defendants, and that they be arrested and imprisoned, or bailed, as the case may be.

GREGORY MONAGHAN
Special Agent
Federal Bureau of Investigation

Sworn to before me this
23rd day of January, 2015

THE HONORABLE FRANK MAAS
UNITED STATES MAGISTRATE JUDGE
SOUTHERN DISTRICT OF NEW YORK